The prisoner was charged with having killed one Samuel Callam. On the trial a witness was introduced on the part of the State who swore that on 11 February, last, which was Sunday, he was sent by the (116) deceased to the house of the prisoner to get a bottle of whiskey, the deceased and prisoner being neighbors. The witness was to procure the whiskey from a son of the prisoner, but the son not being at home the witness was detained, awaiting his return, longer than he had expected and longer than had been foreseen by the deceased. While the witness was sitting in the house by the fire, with the prisoner and one Osborne, he saw the prisoner waive his hand and heard him say at the same time, "clear yourself." The witness, from his position, could not see who was in the yard to whom the prisoner spoke. The prisoner instantly rose from his seat, took a shotgun and went into the piazza where the witness followed him and saw the deceased standing in the yard with his face towards the house. The prisoner raised the gun, presented it at the deceased and snapped it; he then prepared the lock, raised and presented the gun again at the deceased and snapped if a second time. The prisoner then laid the gun on a bench, went into the house, got a rifle, returned into the piazza and fired at the deceased. The ball from the rifle took effect, and the deceased instantly exclaimed. "Lord! Uncle Billy, you have killed me," and died in about an hour after receiving the wound. The deceased was not approaching the house when he was shot, and had not advanced a step towards it after the witness first saw him. He had in his hand a small and very light walking stick, which he held in the ordinary position, with one end on the ground, and he made no attempt to raise it. He did not speak a word to the prisoner until after he was shot, when he made the exclamation above stated. The deceased had no weapon with him except the stick above spoken of. When the prisoner was about to shoot the deceased, the witness attempted to interfere to prevent it, but the prisoner threatened him and he was compelled to desist. Not more than two or three minutes elapsed from the time the prisoner went into the piazza with the shotgun before he fired the rifle. *Page 93 
The prisoner offered to give in evidence testimony to show that the deceased had attempted to use a dirk in two or three different quarrels, but the evidence was objected to by the prosecuting officer and rejected by the court. The prisoner then offered to give in evidence declarations of the deceased, made several months before the killing, (117) when the court was about to reject the testimony upon the ground that those declarations formed no part of that transaction, and that if they had, words were not legal provocation, and could not extenuate the offense, but being assured by the prisoner's counsel that those declarations would not be urged as legal provocation in themselves, but be submitted to the jury as circumstances giving a character to the transaction, and from which the jury could infer the intent with which the deceased visited the prisoner's house, and therefrom deduce inferences explaining the conduct of the deceased there, and having a direct tendency to show that he was assaulting the prisoner, or attempting forcibly to dispossess him of his domicil, the evidence was admitted. Several witnesses were thereupon introduced who stated that several months before the fatal occurrence they heard the deceased, on public occasions and at different places, boast that he had debauched the prisoner's wife, and declare that he could have illicit intercourse with her whenever he pleased. The prisoner then introduced his daughter, who swore that in August last the prisoner and her mother separated and had not since that time lived together; that about a week after the separation the prisoner told her to inform the deceased that he would not go in pursuit of him, but that the deceased must not come to his house; that if the deceased came there he would kill him; that he had parted the prisoner and his wife and he must not come on the prisoner's premises to "pester" him. This message was delivered to the deceased within a few days thereafter, when he replied that he was a free man and would go where he pleased.
The testimony being closed the prisoner's counsel urged that the homicide was justifiable; if not justifiable that it was excusable; and then insisted that if the homicide was felonious, it was only manslaughter and not murder. And the court was requested to instruct the jury: "1st. That if the deceased was expressly forbidden to enter the yard of the prisoner, it was only manslaughter; 2nd. That if the prisoner had forbidden the deceased to come to his house, and the deceased did come, and the prisoner had a well grounded belief that the object of the deceased was unlawful, then it was only manslaughter. 3rd. (118) That if the deceased had been forbidden to come to the house of the prisoner, and he did come and menace the prisoner with violence, either by words or gestures, and refused to go away when ordered, then it was only manslaughter." *Page 94 
His Honor, after stating the different kinds of homicide and explaining what was justifiable, and what excusable, homicide, proceeded to instruct the jury as follows: Felonious homicide includes murder and manslaughter. Murder is the felonious and unlawful killing of one reasonable creature by another, with malice aforethought, either express or implied. Malice is implied, when the circumstances attending the transaction show that the slayer is a man of wicked and depraved disposition, of violent temper, of ungovernable passions, and vindictive feelings, and has a heart regardless of social duty, and fatally bent on mischief. If there be no legal provocation, and the weapon used be fitted and likely to produce death, the law infers malice. Words are not legal provocation. Was the weapon fitted and likely to produce death? If the prisoner had taken the deceased in adultery with his wife, and killed him on the spot, or before his passions had time to cool and subside, it would be manslaughter and not murder. This the law considers the greatest provocation that can be given. But declarations by the deceased that such an act had been committed are mere words, and are not legal provocation; and especially if the killing occurred long after the declarations had been made. The State also insists that the law not only implies malice from the circumstances of this transaction, if they be believed by you, but that there is evidence of express malice. If you be satisfied from the evidence that the prisoner killed the deceased with sedate and deliberate mind, and with a formed design, there is express malice. Former grudges and antecedent menaces are evidence of this formed design. Do the witnesses introduced by the prisoner satisfy you that he entertained grudges, and uttered menaces against the deceased? If so, there is evidence of express malice; and you are to determine, if you be satisfied of its existence. If you believe from the evidence that the homicide was committed under the influence and by the (119) promptings of former grudges, and in pursuance of antecedent menaces, and was not in consequence of the conduct of the deceased at the time of the fatal occurrence, there was malice, and the act was murder.
"But the prisoner insists that it is merely manslaughter. To extenuate the offense from murder to manslaughter it must have been perpetrated in a gust of passion, and that passion must have been excited by legal provocation. Do the circumstances satisfy you that the prisoner acted deliberately and with formed design, and not under the influence of passion? If so it is not manslaughter. But if the deed were perpetrated under the influence of passion, was there legal provocation. Words are not legal provocation. If the killing be with a deadly weapon — one well fitted and likely to produce death, and the provocation be slight, it will not extenuate the crime to manslaughter. The mode of resentment must *Page 95 
bear a reasonable proportion to the provocation given, to reduce the offense to manslaughter. If the deceased were a mere trespasser on the land of the prisoner, by coming there against his will; and if the deceased came there after having been told not to come, as stated by the prisoner's daughter; and if the deceased did not go away instantly when he was ordered, under the circumstances stated by the witness, it would not be such a provocation as would reduce the killing to manslaughter, if the deed were perpetrated under all the circumstances stated by the witness."
The prisoner was convicted of murder and judgment of death being pronounced he appealed.
The court has not perceived anything in the instructions to the jury, taken in connection with the evidence stated, that can authorize a reversal of the judgment.
There was no evidence from which it could be judicially or rationally inferred that the deceased, in word or action, threatened or even that he meditated violence to the person or dwelling of the prisoner. On the contrary the evidence establishes a killing without provocation (120) at the time, upon a formed design and ancient grudge, indicated by express threats, and three repeated attempts to shoot an unarmed and unresisting man. It is a case of express malice, proved by direct evidence.
The judgment must, therefore, be affirmed, and the usual certificate transmitted to the Superior Court, in order that the sentence of the law may be carried into execution.